1              **UNITED STATES DISTRICT COURT**
2              **FOR THE DISTRICT OF NEW JERSEY**
   _____
                                      :  **CIVIL ACTION NUMBER:**
3  CAPITAL HEALTH SYSTEM, INC.,       :  **24-cv-00202**
             Plaintiff,               :
4                                     :
             v.                       :
5                                     :
   SYMMETRY WORKFORCE SOLUTIONS, LLC  :
6  and AYA HEALTHCARE, INC.,          :  **MOTION HEARING**
             Defendants.              :
7  _____

8

         Mitchell H. Cohen Building & U.S. Courthouse
9        4th & Cooper Streets
         Camden, New Jersey 08101
10       June 24, 2024
         Commencing at 2:01 p.m.
11
   **B E F O R E**:          **THE HONORABLE EDWARD S. KIEL,**
12                           **UNITED STATES DISTRICT JUDGE**

13
   **A P P E A R A N C E S**:
14

15       EPSTEIN BECKER & GREEN, P.C.
         BY: ANTHONY ARGIROPOULOS, ESQUIRE
16       BY:  THOMAS KANE, ESQUIRE
         150 College Road West,  Suite 301
17       Princeton, New Jersey 08540
         For the Plaintiff
18

19       MORGAN, LEWIS & BOCKIUS LLP
         BY:  BRIAN W. SHAFFER, ESQUIRE
20       502 Carnegie Center Drive, Suite 301
         Princeton, New Jersey 08540
21       For the Defendants

22
   Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
23          AnnMarie_Mitchell@njd.uscourts.gov
                   (856) 576-7018
24
   Proceedings recorded by mechanical stenography; transcript
25       produced by computer-aided transcription.

1   **A P P E A R A N C E S (Continued):**

2

3       MORGAN, LEWIS & BOCKIUS LLP
        BY:  MICHAEL C. POLOVICH, ESQUIRE
        One Federal Street
4       Boston, Massachusetts 02110
        For the Defendants

5

6   **A L S O   P R E S E N T:**

7

8       GLADYS NOVOA,  Courtroom Deputy

9                               -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*

```
 1            (PROCEEDINGS held in open court before The Honorable
 2   EDWARD S. KIEL at 2:01 p.m.)
 3            THE COURT:  Please be seated.  Good afternoon,
 4   everybody.
 5            Good afternoon.  We're on the record in the matter of
 6   Capital Health Systems v. Symmetry Workforce Solutions, et al.
 7   It's case 24-cv-00202.
 8            First, if I could have the appearance on behalf of
 9   plaintiff, please.
10            MR. ARGIROPOULOS:  Good afternoon, Your Honor.
11   Anthony Argiropoulos and Tom Kane of Epstein Becker & Green
12   representing the plaintiff, Capital Health System, Inc.
13            THE COURT:  Okay.  And on behalf of defendants?
14            MR. SHAFFER:  Good afternoon, Your Honor.  Brian
15   Shaffer and Michael Polovich from Morgan Lewis & Bockius on
16   behalf of the defendants.
17            THE COURT:  Okay.  I put this on just for a telephone
18   conference -- I'm sorry, for a conference today because I like
19   to try to talk through what the issues on a motion to dismiss
20   would be before we get there.
21            I know there was a motion to dismiss before, and the
22   contours of that initial complaint are significantly different
23   than what's in the amended complaint today.  And it seems like
24   that there was some looking at the initial motion to dismiss.
25   I did read the initial motion to dismiss paper, and some of
```

*United States District Court*

1    the counts were dropped and some new counts were added in.

2         And I'm looking at it, I'm sort of scratching my

3    head, because to me -- and I'll throw it to Mr. Shaffer or his

4    colleague first, it seems like this is really a breach of

5    contract claim.  And what I understand from a Consumer Fraud

6    Act claim is that if there is a valid written contract between

7    the parties, and if the conduct is expressly permitted under

8    the contract, then there cannot be a Consumer Fraud Act claim.

9    And there's a question of whether the Consumer Fraud Act

10   itself applies to this type of service.

11        But when I look at the agreement itself, it was

12   attached at ECF Number 9-3 as Exhibit 1, I look at the very

13   words of the contract, and it says, "Symmetry shall use its

14   corporate affiliates or third-party staffing subcontractors,"

15   which is defined as agency, "to provide Candidates under this

16   Agreement."

17        Isn't that what this whole agreement is about, the

18   provision of nurses under this agreement?  And it says in the

19   agreement itself that the defendants -- and I'm looking at

20   Mr. Shaffer, it should be the other side -- that the

21   defendants are -- or Symmetry itself is permitted to use its

22   affiliated company?  And I think that the bulk of the

23   complaint is that Symmetry used an affiliated company, Aya --

24        Is that the way you pronounce it?  Aya?

25        MR. SHAFFER:  Aya.

1          THE COURT:  -- Aya, as part of its staffing needs.

2          So if you could just address that, first.

3          MR. KANE:  Certainly, Your Honor, if I may.

4          So I would say there's really a legal answer to what

5    Your Honor has said and a factual answer.  So we'll take them

6    one by one.

7          First, as a matter of law, what we're really talking

8    about here is fraud in the inducement.  And New Jersey law

9    both as to just any fraud claim and under the Consumer Fraud

10   Act is that if you defraud someone and induce them into a

11   contract, then the terms of the contract, even if they have an

12   integration clause, are not what governs.  It's the fraudulent

13   misrepresentations that were made that got you to enter into

14   that contract.  That is the classic case where you look beyond

15   the four corners.

16         And if you think about it, Your Honor, as a

17   legal/policy matter, there's an obvious reason for that.  The

18   Consumer Fraud Act is a remedial statute.  The New Jersey

19   Supreme Court has said many times it's to be broadly and

20   liberally applied.

21         If you are able to negate a Consumer Fraud Act claim,

22   if you're able to say, yeah, I bought this item under false

23   pretenses, but, you know, just before I signed to pick up that

24   car, that, you know, I thought I was getting a Porsche and I

25   got a Kia instead, just before I signed that contract, there

1  was fine print in there that said integration clause are

2  limited to the four corners of the contract, there would never

3  be a consumer fraud claim because those sorts of things happen

4  all the time.

5        THE COURT:  I think the Consumer Fraud Act claim --

6  well, the fraud in the inducement claim can be separate and

7  apart from the Consumer Fraud Act claim.

8        MR. KANE:  Correct.

9        THE COURT:  And that's why you have separate counts

10  for it.

11        MR. KANE:  Yes.  And they are, but I believe that

12  that body of law does apply to --

13        THE COURT:  But I don't think a fraud in the

14  inducement necessarily results in a Consumer Fraud Act claim.

15  The Consumer Fraud Act claim has to have some unconscionable

16  aggravating circumstances.  And I was reading some cases that

17  are fairly recent from Judge Vazquez and Judge Bumb, I don't

18  know if you cite to those cases, but they basically say if you

19  have a written contract and something is permitted under the

20  written contract, you can't have a Consumer Fraud Act.  You

21  might have a fraud in the inducement claim.  And I have some

22  questions about the fraud in the inducement claim as well.

23        MR. KANE:  Sure, sure.

24        THE COURT:  Can't those two be separated out?

25  Because a fraud in the inducement claim does not equal to a

```
 1   Consumer Fraud Act --
 2          MR. KANE:  I agree, Your Honor, that they are
 3   distinct claims, but I think that we have both here.
 4          I think you can have a situation -- and keep in mind,
 5   there's actually a few different scenarios under the Consumer
 6   Fraud Act.  There are affirmative misrepresentations.  There
 7   are omissions of relevant information.  There's unconscionable
 8   terms.  And then there are regulatory violations.  And we
 9   actually throughout the complaint I think ultimately make
10   claims under all those different elements of --
11          THE COURT:  Under the regulatory?
12          MR. KANE:  Yes.  Yes, there is.
13          THE COURT:  Because there are, like, construction
14   contract -- and those are the regulatory terms that you're
15   talking about.  But I don't know if there's any regulatory
16   terms that the Division of Consumer Affairs has promulgated as
17   to temporary servicing.
18          MR. KANE:  Oh, no, Your Honor, there --
19          THE COURT:  Is there?
20          MR. KANE:  There are.
21          THE COURT:  Okay, okay.  I didn't see those cited in
22   the paper, but --
23          MR. KANE:  Well, I think, Your Honor -- and
24   respectfully, and I don't want to cast aspersions on the other
25   side, but I do think that was something that should have been
```

1   part of their discussion, particularly because they say, for

2   example -- they cite to a body of law saying the Consumer

3   Fraud Act doesn't apply to these sorts of transactions.

4           Well, it does, because -- and this is something they

5   don't cite, there's 56:8-1.1.

6           THE COURT:  I saw the provision of the PEAA --

7           MR. KANE:  Right.

8           THE COURT:  -- which says that this type of service

9   is encompassed in the Consumer Fraud Act.

10          MR. KANE:  Correct.

11          THE COURT:  And that's an issue -- would it be an

12  issue of first impression?  I know that it basically says that

13  it is, but is there case law that interprets that to see --

14          MR. KANE:  Oh, sure, sure, Your Honor.  There is,

15  there is.

16          THE COURT:  And so there's a body of regulatory

17  promulgations as well?

18          MR. KANE:  Yes.

19          THE COURT:  And what in the regulatory promulgations

20  did they violate?

21          MR. KANE:  They weren't registered as -- you know, as

22  a temporary services firm.

23          THE COURT:  Is there a private right of action under

24  that?

25          MR. KANE:  That's because any violation of those

1    regulations are violations of the CFA.

2          THE COURT:  And it's a private right that you have --

3          MR. KANE:  Under the CFA.

4          THE COURT:  -- under their failure to register?

5          MR. KANE:  Yes.

6          THE COURT:  Okay.  Is that -- go ahead.  You can

7    finish.

8          MR. KANE:  But let me talk about -- I said that

9    there's the legal portion of it, Your Honor, but there's also

10   the factual portion.  And let me just give Your Honor

11   30 seconds of background so that this makes sense.

12         What we're dealing with here is an MSP or a managed

13   services provider.  There are two different types of them.

14   And the distinction between those two different types is

15   really key, because it goes to the fraud here.

16         One type is what's called a vendor neutral MSP.  And

17   what that means is we are going to the healthcare provider as

18   the MSP, and we're acting on the healthcare provider's behalf

19   to find it the best deal that it can in the market.  So we're

20   dealing with lots of different nursing vendors that could

21   potentially satisfy the need that the hospital has.  And we,

22   the vendor neutral MSP, are going to find the best deal for

23   you, hospital.  And that's the advantage that we give.

24         And by the way, they get paid a premium for doing

25   that, which is obviously relevant to the ascertainable loss

1  argument that they made.

2          The other type of MSP is sometimes called a single

3  source or a staffing led MSP.  And what that says is, we are

4  the MSP face of a nursing staffing agency.  We're going to

5  staff you with our nurses.  If we run out, we don't have

6  availability, we may go to others.  But you're really -- we're

7  just the face for this staffing agency.

8          THE COURT:  And I understand that you're saying that

9  you were told that it was going to be a vendor neutral MSP.

10         MR. KANE:  Correct.

11         THE COURT:  But there's nothing in the agreement that

12 says that it's vendor neutral.  And what you're saying in the

13 fraud in the inducement claim is that there was all this

14 advertising out there.

15         MR. KANE:  Correct.

16         THE COURT:  It was on their website.  They said it

17 was a vendor neutral company.

18         MR. KANE:  Correct.

19         THE COURT:  But the agreement that you have itself

20 says there's an integration clause --

21         MR. KANE:  Correct.

22         THE COURT:  -- that says that we can hire from our

23 affiliated companies.  Right?

24         MR. KANE:  If you --

25         THE COURT:  How is that fraud in the inducement?

1    MR. KANE:  If you look at that provision of the

2  contract, Your Honor, that is completely -- that, the way it

3  is drafted, is compatible with both being a vendor neutral and

4  a staffing led, because what it says is, we have -- we can use

5  someone that we're affiliated with in addition to other people

6  out in the market.

7    We agree that if they were a vendor neutral -- truly

8  vendor neutral and they went out in the market and they really

9  did have relationships with 57 different vendors as they told

10  us that they did or told my client that they did, and in some

11  instances, under certain scenarios, certain days of the week,

12  whatever it was, the best deal could be had from Aya, if they

13  actually did that, then that's compatible with the contract.

14  And I don't know that we would have a claim, and maybe that's

15  what their defense would be.

16    THE COURT:  Hold on.  I think you're adding something

17  to the complaint.  I don't see anything in your complaint --

18  this is just my recollection -- where an affirmative

19  representation was made by somebody from defendant, from

20  Symmetry, to your client saying that we're going to be a

21  vendor neutral MSP.  All I saw was that there was a lot of

22  advertising, and I didn't see any allegation itself that said

23  that your client actually looked at that advertising or

24  somebody made that affirmative representation before they

25  entered into the contract.  I didn't see that.

1       MR. KANE:  Your Honor, it happened not just before

2   obviously with the advertising but it happened during the

3   course of the relationship.

4       THE COURT:  But -- oh, that's different.  During the

5   course of the relationship is different.

6       What you're talking about is fraud in the inducement.

7   Fraud in the inducement talks about at the time of

8   contracting, there was some fraudulent statement that was made

9   prior to the contracting.  Right?

10      MR. KANE:  Except, Your Honor, what I would say is

11  this:  We could also have gotten out of the contract.  So if

12  they're continuing to make those misrepresentations along the

13  way, which they clearly did in email.  There's a point in time

14  where we said we are --

15      THE COURT:  That's a breach of contract claim.

16  That's a breach of contract.  You have a fraud in the

17  inducement claim.  And I don't see anything in the complaint

18  that says, first of all -- well, fraud in the inducement has

19  to be some misrepresentation that the defendant made with the

20  intent to deceive you.

21      MR. KANE:  Correct.

22      THE COURT:  And that fraudulent representation has to

23  be made to you.

24      MR. KANE:  Yes.

25      THE COURT:  Right?

*United States District Court*

```
 1              And you're talking about something on a website.  But
 2    there's no allegation that anybody from your company took a
 3    look at that website or they were induced by it.  Right?  I
 4    don't see anything in the complaint.
 5              MR. KANE:  No, Your Honor, we do specifically say
 6    that our people knew that and acted in reliance on it.  That's
 7    the inducement.
 8              THE COURT:  Is there a paragraph of the complaint --
 9    and I'll give you time to take a look at it.  And that's why I
10    have the issue with the fraud in the inducement, because you
11    keep talking about the vendor neutral representation that was
12    made.  But I don't see an affirmative representation that was
13    made from Symmetry to your client that says we're going to be
14    vendor neutral.  What I have instead is Exhibit 1 of that
15    filing on February 2nd which says the complete opposite.  We
16    can use a corporate affiliate.
17              And -- go ahead.
18              MR. KANE:  Again, Your Honor, saying we have the
19    option of using a corporate affiliate is different than having
20    done a vendor neutral analysis to find the best deal for my
21    client.  If it so happened that someone who was affiliated
22    with them was the best deal after they looked at 57 different
23    vendors, which is the representation that was made, and
24    they -- and that was -- under those circumstances, that's one
25    thing.  And if that's their defense, then maybe we'll hear
```

*United States District Court*

1    that.

2         But what we're saying is you never intended to be

3    vendor neutral.  You sold us one thing, it was a bait and

4    switch.  You advertised and said that you were going to do one

5    service, and you gave us something entirely different, which

6    is not as advantageous for us, and that we relied on it.

7         THE COURT:  Well, you have an interpretation of the

8    contract that may be different from what the defendants have

9    an interpretation of the contract.  You're reading that

10   provision that I read before, which is (I)(b)(iii) that says

11   "Symmetry shall use its corporate affiliates or third-party

12   staffing."  But you're saying that that doesn't permit them to

13   just use their corporate affiliate staffing.  Right?  That

14   that requires them to do something beyond that and get all of

15   these other bids and everything to figure out what the best

16   price is for you.  Right?

17        But that sounds like a breach of contract claim to

18   me, and --

19        MR. KANE:  I want to be careful --

20        (Court reporter clarification.)

21        THE COURT:  Go ahead.

22        MR. KANE:  I'm sorry for interrupting.

23        THE COURT:  It's okay.

24        MR. KANE:  I want to be careful because I'm not

25   saying it's a breach of contract.  What I'm saying is you

1    induced us.  You told us this was what you were going to do,

2    that you would be vendor neutral, that you would work with 57

3    different vendors.  Then you gave us a contract that said,

4    well, yeah, we're going to work with some vendors who are not

5    affiliated.  We might work with people who we are affiliated

6    with.

7            It did not say, significantly, Your Honor, we are not

8    vendor neutral, we are staffing led, and you are only going to

9    be working with Aya or Aya 71 percent of the time.

10           They had told us it was going to be vendor neutral.

11   Then they gave us a contract that is literally ambivalent,

12   that says, well, we may use somebody who is affiliated with us

13   or we may not and could be read either way.

14           THE COURT:  You're represented by counsel, and I

15   would find it hard to believe that your company is led into

16   entering contracts without reading them over and understanding

17   what they mean.  Right?

18           MR. KANE:  But, Your Honor, respectfully, if you put

19   yourself in the shoes of someone who has been told we're a

20   vendor neutral organization, this is what we do, we're vendor

21   neutral, then they see that provision, and you would read it

22   as oh, okay, well, yeah, they're vendor neutral, but sometimes

23   the one that they're affiliated with might win.

24           THE COURT:  Maybe your colleague was looking for that

25   provision.  I don't know if you have a copy of the complaint

1  where that allegation is made -- I can see if there's an

2  allegation that somebody from Symmetry came to your company

3  and said, we're going to be vendor neutral, we're going to use

4  57 different agencies to get the best price, and that was done

5  before the execution of the agreement, that would be fraud in

6  the inducement if they later on -- or could potentially be

7  fraud in the inducement if they later on didn't live up to

8  that representation.  But I don't see -- let me just ask them.

9        Am I right?  Is there a representation in the amended

10 complaint itself that talks about this direct and fraudulent

11 representation that was made?

12       MR. POLOVICH:  There's not, Judge Kiel.  And,

13 actually, I just want to point out the very next sentence of

14 that paragraph that we've been talking about.

15       THE COURT:  That's in the contract?

16       MR. POLOVICH:  Yes.  So we've been focusing on the

17 sentence that says that Symmetry shall use corporate

18 afilliates or third-party agencies.  But the very next

19 sentence addresses the issue of neutrality.  And it says,

20 "Symmetry shall have the discretion to choose its Agencies."

21       So while my colleague just represented to the Court

22 that the contract was, quote, ambivalent about neutrality,

23 it's actually the exact opposite.  The contract expressly

24 addresses that question, and it expressly states that Symmetry

25 has discretion.  That's the opposite of promising vendor

```
 1   neutrality.

 2            Now, with respect to fraud in the inducement, the

 3   exact reason that we have inadmissible parol evidence in

 4   situations like this is where you have sophisticated parties.

 5   You have a fully integrated contract, one that, as this one

 6   does, expressly says that the parties disclaim reliance on any

 7   representations not contained in the four corners, is when a

 8   contract addresses the very thing that you're citing parol

 9   evidence for, that's when that parol evidence is inadmissible.

10            THE COURT:  Let me talk about the Consumer Fraud Act.

11   And this is sort of the question that I have.

12            Well, first of all, you have a question whether the

13   Consumer Fraud Act applies at all.  And you say it doesn't

14   because it's not a consumer product, it's not a consumer

15   transaction.

16            But there's a provision in the Consumer Fraud Act

17   itself that says this type of business is subject to the

18   Consumer Fraud Act.

19            Now, I understand your argument about the learned

20   professional.

21            MR. POLOVICH:  Yes.

22            THE COURT:  But you're not selling learned

23   professional services.  You're selling the services of learned

24   professionals.  Right?

25            MR. POLOVICH:  Yes.
```

 1          THE COURT:  That's a completely different thing.  And

 2   it seems to me that that would fall within the ambit of the

 3   Consumer Fraud Act.  But let me hear from you on that.

 4          MR. POLOVICH:  Sure.  I'd like to make two separate

 5   points to address that.

 6          So the first is actually before we even get to the

 7   question of learned professionals exemption.  And I just want

 8   to point out that this count, Count 4 about regulatory

 9   violations, is only made against Symmetry.  It's not made

10   against Aya.  And there's a reason for that.

11          Aya is registered as the temporary help services

12   firm, as the temporary healthcare firm in the state of New

13   Jersey.  And there's a reason for at that.  Because the

14   definitions of both of those -- of both of those, I guess,

15   titles that you could give to a company require that that

16   company employs the individuals that, you know, fall under

17   those definitions.

18          THE COURT:  Okay.  And you're an intermediary --

19   Symmetry is an intermediary that didn't have to be registered?

20          MR. POLOVICH:  Right.  And the complaint actually has

21   a bunch of details about how MSPs, you know, aggregate and

22   source staffing from agencies that have these nurses.

23          So, I mean, there's a reason that that is the only

24   count that is only made against Symmetry.  And so before we

25   even get to the assumption that those regulatory definitions

1    apply, I think there is a question that would have to be

2    answered.  And we can of course develop that through the

3    briefing.

4            As to the learned professionals exemptions, I agree

5    with the Court that that question has not yet been squarely

6    answered by case law.

7            First of all, there's not a case that says nurses

8    aren't professionals.  But beyond that, there's obviously not

9    a case that says --

10           THE COURT:  I think nurses are learned professionals.

11   I think they would --

12           MR. POLOVICH:  I agree.  I think that would be pretty

13   obvious.

14           THE COURT:  That would be obvious.

15           MR. POLOVICH:  In full candor, right, we don't have a

16   case that says that yet.

17           And then even if we get to the conclusion they are

18   learned professionals, we have the next question of would that

19   exemption extend to the companies that are either sourcing or

20   aggregating or supplying them.

21           And we've cited cases.  You said that you read the

22   initial motion to dismiss --

23           THE COURT:  I did.

24           MR. POLOVICH:  -- as well as the letters.

25           You've seen that we've developed a line of cases that

1   at least raise I think a very plausible argument that is

2   worthy of the parties' briefing all the nuances of that back

3   and forth.  Where there are instances where the suppliers,

4   right, companies such as the lab diagnostic companies, the

5   hospitals, law firms, so actual corporate entities, have been

6   held to be exempt, particularly when the claims go to things

7   such as allegations of overbilling, as they do here.

8         So I think that at a bare minimum that question is

9   worth being developed through.

10        THE COURT:  And I certainly never prohibit the filing

11  of a motion to dismiss.  I just like to flesh things out a

12  little bit and discuss it.

13        I think there are significant questions of whether

14  the Consumer Fraud Act, even if it did apply, would provide a

15  plausible claim, given that there's a written contract.

16        And just to give you the two cites, the one from

17  Judge Vazquez was *Marshal v. Verde Energy*.  It's 2019 WL

18  1254562.  And that was a case where there was a discount

19  energy company, and the discount energy company went to

20  consumers and said, hey, we're going to give you much less

21  charges than PSE&G or whoever it was giving their energy.  It

22  didn't turn out to be true, but there was a written agreement.

23  And the written agreement said that -- well, the written

24  agreement didn't provide for that kind of solid

25  representation, and Judge Vazquez said that there was no

1   Consumer Fraud Act because the contract itself applies and the

2   Consumer Fraud Act can't be used as a way to get around the

3   written contract between the parties.

4        And Judge Bumb had a case *Dautrich*, D-A-U-T-R-I-C-H,

5   *v. Nationstar Mortgage*, 2018 WL 3021786.  Basically the same

6   thing, if you have a written contract, you have a breach of

7   contract claim.  If there's something done in violation of the

8   contract and there needs to be something beyond a breach,

9   substantial aggravating circumstances.

10       And also, just the thing that you might want to

11  address in your discussion if you do file a motion to dismiss,

12  whether this is a jury question or a legal question.  And I

13  read Judge Vazquez's opinion whether a business practice is

14  unfair is a question for the jury, but if the claim is founded

15  on written statements, then the Court must make a legal

16  decision whether the practice is unlawful in light of the

17  writing.

18       So I give you some of that guideline.

19       So is there anything further, like, for example, on

20  the fraud in the inducement claim, do you want to address that

21  at all?

22       MR. POLOVICH:  Sure.  So as we already noted, I think

23  that the fraud in inducement claim is barred by parol evidence

24  here.

25       The entirety of the claim -- and I think Your Honor

1   pointed this out from the get-go.  I mean, the complaint here

2   kind of suffers from a square peg/round hole problem because

3   we do have a contract that governs.

4        THE COURT:  Let's say they do file a second amended

5   complaint and they say that we have records that John Smith

6   from Symmetry made the representation that it'd be vendor

7   neutral and we're not going to ever use our affiliates.

8        Does that get past a motion to dismiss?

9        MR. POLOVICH:  No, not at all.  And the reason for

10  that -- and actually, not only does it not get past it, we

11  would still be dismissed with prejudice.  And the reason for

12  that is that the case law makes clear that the only exception

13  for parol evidence is when that parol evidence, when you're

14  using it for fraud in the inducement, when it speaks to what

15  the case law calls something, quote, extraneous to the

16  contract.  And what it goes on to explain, extraneous means a

17  subject or topic that the contract does not address.

18       THE COURT:  Right.

19       MR. POLOVICH:  And as we've talked at length --

20       THE COURT:  Right.  The parol evidence on a fraud in

21  the inducement can't contradict the terms of the written

22  contract.

23       MR. POLOVICH:  Right.  And here the contract

24  expressly says that Symmetry has discretion.

25       THE COURT:  Plaintiff, if you put that in there,

*United States District Court*

```
 1  isn't that kind of representation, even if it's made, barred
 2  because -- it wouldn't be permitted under fraud in the
 3  inducement, because that representation would be contrary to
 4  what the written agreement says?
 5           MR. KANE:  Your Honor, respectfully, I don't think it
 6  is.  To say -- again, what you're talking about is the model
 7  of what we're doing.  To say that you have discretion to
 8  choose someone after you've done a vendor neutral analysis is
 9  different than saying, we told you we were going to do a
10  vendor neutral analysis but we're not doing it.  And that's
11  the difference, is that someone having been told -- and I
12  would just say, Your Honor, before I forget, I direct the
13  Court's attention to paragraph 272.  That is one of the spots
14  in the complaint where we specifically say that Capital Health
15  relied on this knowing misrepresentation when entering into
16  the agreement.
17           THE COURT:  Yes, but where does that knowing
18  misrepresentation come from?  Does it come from the
19  advertising that was out there on their website, or was there
20  an affirmative representation that was made to your company
21  from somebody from Symmetry before entering into the contract?
22           MR. KANE:  So I would say that there's three
23  different types, Your Honor.
24           One is that there was an NJHA letter, where there was
25  advertising that came via the NJHA to all the hospitals in the
```

1  area, including Capital Health.

2           THE COURT:  I saw that, and it says that the NJHA

3  letter came to all the hospitals.  It doesn't say that your

4  client looked at it and relied upon the representations

5  therein.

6           MR. KANE:  Well, Your Honor, I think that's what

7  paragraph 272 says.

8           Respectfully, Your Honor, what I would say is maybe

9  this is something about pleading.  And under a 9(b) standard,

10  we have to give the who, what, where, when of the fraud, what

11  they did.

12           THE COURT:  Right.

13           MR. KANE:  Who said it from them, when did they say

14  it.  And we've done all that.  In fact, we've attached it.

15           That doesn't mean that as a matter of pleading when

16  we're saying that the reliance element, not the fraud element,

17  not the misrepresentation element, but the reliance element,

18  that we have to say who within our organization did.

19           THE COURT:  Where's the fraud element?  Where's the

20  affirmative misrepresentation?

21           And let me just make one comment that I like to make

22  to very sophisticated counsel like you.

23           I always find it cute, you know, look over here, when

24  somebody removes and says -- and immediately files a motion to

25  dismiss saying that it's not based upon -- it's not plausible

1  based upon federal pleadings.

2          MR. KANE:  Sure.

3          THE COURT:  I always wish the parties could talk to

4  each other before filing a motion to dismiss.  I know you were

5  before Judge Castner, but that's a thing that I like to at

6  least ask counsel to do when a case is removed and a state

7  complaint doesn't meet federal pleadings to talk to each other

8  before a motion to dismiss is filed.

9          MR. KANE:  Sure.  And obviously, that was the case

10  here, Your Honor.  New Jersey state courts do not follow

11  Twombly.  It was not a Twombly-oriented initial complaint.

12  And so once we --

13          THE COURT:  But the special pleading requirements of

14  9(b) require you to state with specificity what the

15  misrepresentations were.  Right?

16          MR. KANE:  Yes.

17          THE COURT:  And that's the fraudulent

18  misrepresentation part.  There is the reliance part that

19  you're talking about, but I still haven't gotten that answer

20  from you, I don't think, where in the complaint does it say

21  that there was an affirmative representation that was made to

22  you from Symmetry.  You're talking about a letter from NJHA.

23  That's not from Symmetry to you.  Right?

24          MR. KANE:  No.

25          THE COURT:  You're talking about advertising on the

 1   website.  That's not to you.  Right?

 2        MR. KANE:  Well, Your Honor, I would say a few

 3   different things.

 4        First, the letter was sent in conjunction, NJHA

 5   together with Symmetry sent it to all the hospitals, so I

 6   don't think they can disavow that.

 7        Two, it's certainly the case -- and there's a lot of

 8   case law under the CFA -- that misrepresentations on a website

 9   if you rely on them can be the basis of a CFA claim.  If our

10   people saw that and relied on it, and that's exactly what

11   we're pleading --

12        THE COURT:  If they saw it.

13        MR. KANE:  -- under two separate --

14        Well, we've pled -- we pled that they have, Your

15   Honor, under 272.  And respectfully --

16        THE COURT:  Let me read 272.

17        "Defendants' representations about Symmetry being

18   100% Vendor Neutral was material to the Agreement, and Capital

19   Health relied on this knowingly misrepresentation when

20   entering into the Agreement."

21        That sounds like a conclusory statement.  I mean, are

22   you going back and saying all the things that we said before

23   are the misrepresentations, the letter, the website?  But, and

24   I ask you pointedly again, other than the letter and the

25   website, is there anything in the complaint that says that

1  there was an affirmative particular representation or

2  misrepresentation made to your company?

3         MR. KANE:  And it's part of the same conduct, Your

4  Honor.  And I know Your Honor may have a different view on

5  this than we did.

6         But we by email affirmatively said to them, what's --

7  you know, are you using Aya, what's your relationship with

8  Aya.  And they lied.  And they lied consistent with what they

9  said in those emails and in the NJHA letter.

10        THE COURT:  Wasn't that after the execution of the

11  agreement?

12        MR. KANE:  It was, Your Honor, but so maybe at

13  best --

14        THE COURT:  So how do you go back with that statement

15  and create fraud in the inducement?  Fraud in the inducement

16  means that you were told before you executed the contract.

17        MR. KANE:  Because we could -- if they had told us

18  the truth that day and said, we lied to you in the NJHA

19  letter, we lied to you in our advertising, we're not vendor

20  neutral, we're led by Aya, we could have terminated the

21  contract and we could have gone and found a vendor neutral

22  company to deal with.

23        THE COURT:  Could have terminated the contract if

24  they were truthful to you.  And that's to me, as I said

25  before, a breach of contract claim.

1        Okay.  I understand.

2        MR. KANE:  I think that is in essence a form of fraud

3   in the inducement, Your Honor.

4        And particularly, I don't think, Your Honor, that you

5   can look at fraud --

6        THE COURT:  A fraud in the inducement.

7        I'm sorry to interrupt you.

8        So you're saying you can have a fraud in the

9   indictment claim in the continuation of a contract.  That's

10  what you're saying?

11       MR. KANE:  Yes.  Although I want to be clear about

12  something, Your Honor.  We got the NJHA letter.  We saw what

13  was on the website.  We relied on those things.  That's what

14  the pleading is.

15       If Your Honor is saying I'm required as a matter of

16  pleading to name who it was in our organization that saw those

17  things and relied on them, respectfully, I don't think that's

18  true.  I don't think that's a requirement.  But if we can,

19  then we should be given the opportunity to do that.

20       THE COURT:  No, I don't think that that's a

21  requirement.  I think what the requirement is, is to state

22  with particularity particularly the fraudulent inducement

23  claims and the straight up fraud claims.  I don't know in the

24  CFA if that's required.

25       But under the pleadings standard, you've got to say

1    with particularity the who, what, where and when.  Right?  And

2    here there's no who, what, where and when.  There's no who

3    made the statement from Symmetry, what was -- when was it

4    discussed, was it leading up to the negotiations of the

5    execution of the contract.  I don't see that in the complaint.

6            MR. KANE:  Respectfully, Your Honor, I think the

7    difference that we're having is that Your Honor doesn't think

8    an affirmative misrepresentation can be advertising and

9    advertising via the internet.  And respectfully, respectfully,

10   Your Honor --

11           THE COURT:  You can --

12           MR. KANE:  -- I think that's very wrong.  I think

13   that would be erroneous to hold.

14           THE COURT:  That's not what I'm saying.

15           MR. KANE:  Okay.

16           THE COURT:  Somebody from your company had to have

17   seen it.

18           MR. KANE:  Yes, yes.

19           THE COURT:  That representation is not here or that

20   allegation is not here as far as I've seen it.  I think I read

21   the entire 67 pages of the complaint, and I didn't see

22   anything in the complaint that said your -- somebody from your

23   company read that website, saw it and then relied upon it in

24   entering into the agreement.

25           MR. KANE:  Well, Your Honor, that's what I think 272

 1    is saying when it's talking about those misrepresentations.   I

 2    mean, do we have to break it down from a pleading point of

 3    view for each one and say, so and so saw this and so and so

 4    saw that?  I don't think that's what's required by 9(b) or any

 5    other pleadings standard.

 6            But if that's the case, then we certainly shouldn't

 7    be kicked out of court for that, particularly where there's a

 8    record here I think that's undeniable that there was a bait

 9    and switch.  I mean, they said they were vendor neutral.

10    They're clearly not.  That's -- they were clearly lying about

11    what they were.  And now -- and if that's the case, if there's

12    some -- that rather than finding out in discovery who all from

13    Capital Health saw it, if we have to say it in a pleading, we

14    should be given that opportunity.  Right?

15            THE COURT:  Well, I guess you're saying all these

16    misrepresentations that were in the NJHA letter and the

17    advertising and by saying in paragraph 272 that Capital Health

18    relied on those misrepresentations when entering into the

19    agreement, that that's sufficient for fraud?

20            MR. KANE:  I think it is, Your Honor, under my

21    understanding of the pleadings standard.  If I'm not, I would

22    ask for the opportunity to replead it.

23            THE COURT:  Let me ask from the defendants'

24    perspective, what if they put in there -- and I know that

25    there's there -- well, there is the question of whether it

 1    contradicts the contract itself.  Putting that aside.

 2          MR. POLOVICH:  Yes, Your Honor.  Just to briefly

 3    address what I'm talking about.

 4          THE COURT:  Yes.  Go ahead, go ahead.

 5          MR. POLOVICH:  And I'll quote from a case, *John Wiley*

 6    *& sons v.*" -- I'm not sure how to pronounce the other word.

 7          THE COURT:  New Jersey Supreme Court case.  Right?

 8          MR. POLOVICH:  No.  It's a DNJ case from 2016.

 9          THE COURT:  Oh, it's DNJ?

10          MR. POLOVICH:  179 F. Supp. 3d 407.

11          THE COURT:  Okay.

12          MR. POLOVICH:  And the case says that to satisfy

13    Rule 9(b), a plaintiff must plead facts showing who made a

14    misrepresentation and to whom.  So 9(b) actually does require

15    them to give that level of specificity.

16          Additionally, in another case -- and this one is

17    cited in our letter.  It's the *Wegmans Food Markets*, 124 F.

18    Supp. 3d 360.  That case deals with advertisements.  And it

19    goes on to explain that you do have to state what

20    advertisements you saw, when you saw them and how they induced

21    you to act.

22          THE COURT:  That's what I thought the law was on

23    pleadings, that you had to do the who, what, where and when:

24    Who made the statement, when it was made, who was it made to.

25    That's my understanding, but I'll certainly look at your

*United States District Court*

1    argument when it comes in.  I thought the *John Wiley* thing was

2    about parol evidence.  I thought that was -- it's not about

3    parol evidence.  All right.

4        MR. POLOVICH:  And just to be clear, I do agree that

5    this particular point we're discussing here could be something

6    that could be cured in another pleading potentially.  That's

7    why, you know, there are other arguments I think that are just

8    positive that would lead to dismissal with prejudice.

9        THE COURT:  Right.  If we could clear that up, that

10   argument could be put away, by the wayside, and then we can

11   get directly to the issue of whether it contradicts the terms

12   of the written agreement itself.

13       MR. POLOVICH:  Yes.  And whether the written

14   agreement bars them from relying on this other extraneous

15   representations.

16       THE COURT:  And I guess that's why I have these

17   conferences, to see whether we can shore it up a little bit,

18   get rid of some of those issues.  Maybe you could do the who,

19   what, where and when a little bit clearer and then just

20   discuss it among yourselves.  And if you don't want to do

21   that, that's fine.

22       MR. KANE:  Well, I guess, Your Honor, the question

23   is, would Your Honor or opposing counsel like us to simply

24   replead before we have a motion?

25       THE COURT:  That's going to be up to you, but I would

```
 1    suggest it and get rid of that issue itself as to the pleading
 2    with particularity with the fraud claims.  Put those in there
 3    more specifically.  I know you say that 272 does it, but maybe
 4    you could talk about who made the representation, when it was
 5    made and those types of things.  And we can go directly to
 6    whether the CFA applies even and whether the fraud claims are
 7    plausible given what's written in the contract itself.
 8              MR. KANE:  Understood, Your Honor.
 9              THE COURT:  And we'll enter a text order today saying
10    you're granted leave to file your motion to dismiss.
11              If you do, please do talk to each other about a
12    briefing schedule.
13              Given our discussions today, I'm not going to have
14    discovery proceed at this point.  Let's see what the motion to
15    dismiss says when and if it's filed.  All right?
16              MR. KANE:  Understood, Your Honor.
17              THE COURT:  Anything further for the plaintiff?
18              MR. KANE:  No.  Thank you, Your Honor.
19              MR. ARGIROPOULOS:  If I may, Your Honor, so I'm
20    clear.
21              THE COURT:  Sure.
22              MR. ARGIROPOULOS:  It seems to me that what I've
23    heard is -- and this isn't argument, this is just procedural.
24    Tom covered the argument.
25              THE COURT:  Sure.
```

1       MR. ARGIROPOULOS:  So the defendants have leave to

2  grant (sic) a motion to dismiss after our conference.

3       Based on what we heard -- and I don't want to put

4  words in counsel's mouth -- a repleading, a second amended

5  complaint, would address a number of the questions that Your

6  Honor has raised and that counsel has raised.

7       So does it --

8       THE COURT:  You don't have to go through the

9  pre-motion conference procedure again.

10       MR. ARGIROPOULOS:  Yes.

11       THE COURT:  If you file a second amended complaint

12  and everybody is going to agree to that -- I don't think

13  you're going to object to the filing of a second amended

14  complaint -- then from there you don't have to go through the

15  whole process again.  You just file a motion on that.

16       MR. ARGIROPOULOS:  Right.  And so my question would

17  be, you know, I don't want to see us in a position where

18  counsel files a motion to dismiss, a week later here's our

19  repleading, and everyone's thinking, what are we doing, we're

20  wasting a lot of time.

21       THE COURT:  Yes.

22       MR. ARGIROPOULOS:  I'd like to stage this, so give us

23  a time period to replead and then --

24       MR. SHAFFER:  Yes.

25       THE COURT:  Yes.  Go talk to each other.  You guys

*United States District Court*

1  are reasonable people.

2          MR. ARGIROPOULOS:  Okay.  You're good with that.

3  Right?

4          MR. SHAFFER:  Yes.  And if we reach agreement, then

5  we would provide a stipulated order or something with the new

6  dates and deadlines.

7          THE COURT:  100 percent, yes.

8          And talk to each about scheduling.  If you have a

9  conference and decide that there's going to be a second

10  amended complaint, just send in a proposed consent order,

11  you'll file it within 30 days and you'll file your motion to

12  dismiss within 30 days, something like that.

13          MR. POLOVICH:  Just to be clear on there, if there is

14  a second amended complaint, we don't need to go through the

15  pre-motion letter process?

16          THE COURT:  No.

17          MR. POLOVICH:  We can proceed directly to filing a

18  substantive motion?

19          THE COURT:  No.  Exactly.  I think we've talked

20  enough about it.

21          MR. POLOVICH:  Yes.  Okay.  I just wanted to clarify

22  that.

23          THE COURT:  All right.  Very good.  Well, thank you

24  very much for the good arguments.  I always very much

25  appreciate it when counsel come prepared to talk about issues.

*United States District Court*

1          RESPONSE:  Thank you, Your Honor.

2          THE COURT:  We're off the record.

3          COURTROOM DEPUTY:  All rise.

4          (Proceedings adjourned at 2:41 p.m.)

5

        - - - - - - - - - - - - - - - - - - - - - -
6       **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
        - - - - - - - - - - - - - - - - - - - - - -
7

8          I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11  */S/ Ann Marie Mitchell        26th day of June, 2024*

12  *CCR-RDR-RMR-CRR*
    *Court Reporter/Transcriber*
13

14

15

16

17

18

19

20

21

22

23

24

25